IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 1:09CR413-1 |
| | ) | |
| RICHARD EDWARD CABEY | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the Motion of Defendant Richard Cabey ("Cabey") to suppress evidence, including a handgun, seized as a result of the search of his automobile following a stop by law enforcement officers. (Doc. 15.) The parties have briefed the issues (Docs. 16, 18), and an evidentiary hearing was held on February 11, 2010. The motion is now ripe for decision.

**I. BACKGROUND**

At the evidentiary hearing, the Government presented evidence through the testimony of the following law enforcement officers: Patrolman Andrew Gerringer of the Burlington (North Carolina) Police Department ("BPD"); Sergeant Tony Velez of the Graham (North Carolina) Police Department ("GPD"); and Corporal Kathy Edmonds of the Alamance County (North Carolina) Sheriff's

Office ("ACSO").[1]  The court finds the testimony of all three law enforcement officers to be credible and finds the following facts:

On August 28, 2009, Officer Gerringer was assigned to robbery patrol in the area of the cities of Burlington and Graham, North Carolina.  The area had seen a rash of a dozen convenient store robberies in the last month.  At approximately 4:00 p.m., Gerringer reviewed video of a recent robbery on August 22, 2009, at a "Stop and Shop" convenience store located in Graham (the "August 22 robbery").  The video displayed, among other things, a white Pontiac four-door automobile believed to have been the getaway car.  Gerringer was also provided background information on the robbery, which included that the suspect was reported to be a black male who parked his vehicle on a side street, entered the convenience store on foot, robbed it at gunpoint while wearing a facial covering, and fled in a vehicle believed to be the white Pontiac.  In particular, Gerringer noted that the white Pontiac had unique and distinguishing features, including the presence of three vent holes on the front quarter panel, a small fin on the back trunk, distinctive rims on the wheels, and a blue oval on the front

---

[1]  Burlington is adjacent to Graham, and both lie in Alamance County, North Carolina.

2

bumper in the area of the license plate. The vehicle stood out to Gerringer because it was similar to one his girlfriend owned.

At 5:00 p.m. that afternoon, Gerringer embarked on his routine patrol in an unmarked police car attempting to locate the vehicle from the August 22 robbery. He began patrolling around stores known to have been robbed. While near the intersection of North Mebane and Beaumont Streets in Burlington, which is the location of the IH Foodmart, Gerringer observed a vehicle similar in description to the suspect's vehicle from the August 22 robbery. Gerringer's attention was drawn to the vehicle because it was moving at approximately 15 mph, much slower than the general flow of traffic traveling at approximately 30 to 40 mph. Despite the fact that the traffic light was green, the vehicle came to almost a complete stop in the road near the IH Foodmart. As the driver continued, he turned to look back at the IH Foodmart as he slowly drove by and turned onto a side street. From what Gerringer could see, the appearance of the driver was consistent with the slender black male he saw in the video of the August 22 robbery. Most notably, Gerringer observed that the vehicle had what he termed "vast similarities" with that in the video: its make and color (both outside and inside) appeared to match the vehicle in the video of the August 22 robbery; it had three after-market vent holes in the front quarter panel; it had a back fin; and its

3

rims appeared to be the same. Based on this conduct and these similarities, Gerringer became suspicious that the driver was casing the IH Foodmart for a robbery. The convenience store had five foot windows that allowed passers-by, including Gerringer and thus the vehicle driver, to see inside the store to determine whether a clerk and other customers were present.

Gerringer followed the vehicle as it slowly made a right turn past the IH Foodmart and continued slowly down the road, eventually turning right again and continuing on that road. It eventually turned right yet again so as to ultimately double back to within 60 to 70 yards of the IH Foodmart. Gerringer positioned himself to view the front bumper of the vehicle and observed a blue oval matching that of the vehicle in the video of the August 22 robbery. The suspect returned to a normal pace and began to leave the scene.

Gerringer called for assistance and decided to stop the vehicle because he believed it was the one used in the August 22 robbery. Based on his knowledge that the August 22 robber had used a firearm and had parked his car in a secluded area, Gerringer used a high risk traffic stop, utilizing more than one patrol car and directing the driver out of the car with firearms drawn in order to reduce harm to officers. The driver, Defendant Cabey, was ordered out of the car. While Gerringer believed that Cabey's vehicle was the same as that used in the

August 22 robbery, he contacted his patrol partner, who in turn contacted Sgt. Velez, to request that photos from the August 22 robbery be brought immediately to the scene to corroborate Gerringer's conclusion.

While Gerringer was waiting for the photographs, Corporal Dunnagan, an ACSO officer who had arrived at the scene, asked whether a police dog should be brought to the scene. Gerringer agreed because, in his view, many armed robberies were conducted either for narcotics or because the robbers were under their influence. Cabey, who was driving the vehicle, was detained in handcuffs for investigative purposes approximately 30 yards away in a convenience store parking lot, but he was told he was not under arrest.

Sergeant Velez, who had directed another from his office to collect the surveillance footage from the August 22 robbery, arrived in response to Gerringer's call. Corporal Edmonds then arrived with "Robbie," her canine with whom she has worked for 9 years. Together, Edmonds and Robbie have 1,431 hours of specialized training, which includes eight to sixteen hours of monthly training. Robby is trained in narcotics, obedience, criminal apprehension and tracking. Edmonds, who arrived at the scene within five minutes of the call to her, met with Gerringer and satisfied herself there was an appropriate reason to conduct a dog sniff.

5

As Edmonds deployed Robbie, the dog alerted at the driver door. Edmonds heard Cabey say at that time that he did not care if they put the dog in the car. Edmonds informed Gerringer that the dog had alerted, and the dog was placed in the vehicle, where it alerted to a spot on the floorboard and at the armrest between the driver and passenger seats. At the armrest, Robbie alerted to a blue cloth, which was described by some witnesses as a "do rag."[2] As the dog began to pull on the cloth, Edmonds removed Robbie out of concern that the cloth might be evidence. As officers lifted the armrest, they observed a black .380 caliber handgun lying on the seat.

Sometime thereafter, and approximately 30 to 35 minutes after the initial stop of Cabey's vehicle, a GPD officer arrived with a CD disk containing the images and video from the August 22 robbery.[3] Gerringer and Velez reviewed the images and confirmed that Cabey's vehicle matched that of the suspect in the August 22 robbery.

Cabey was charged with possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1) and the enhanced

---

[2] The term, originating from "hairdo," describes a cloth generally worn to cover one's hair. Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/do-rag (last visited Feb. 12, 2010).

[3] Sergeant Velez arrived before Corporal Edmonds and approximately twenty to twenty-five minutes before the arrival of the surveillance footage.

penalties under section 924(e).  He now moves to suppress the .380 handgun and any other evidence seized as a result of the search of his vehicle.

**II.  ANALYSIS**

The temporary detention of individuals during the stop of an automobile by the police constitutes a seizure within the meaning of the Fourth Amendment "no matter how brief the detention or how limited its purpose."  United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).  "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."  Id. (quoting Whren v. United States, 517 U.S. 806, 810 (1996)).  Where the police act without a warrant, the Government bears the burden of proving the validity of a challenged search.  United States v. Vickers, 540 F.3d 356, 360 (5th Cir. 2008).

**A.   Initial Stop of Vehicle**

Cabey argues that officers lacked reasonable suspicion to stop his vehicle because no traffic violation was observed and, while his vehicle fit the description of that suspected of being involved in the August 22 robbery, Cabey was stopped nearly one week later and in a different city.  The Government contends that the stop was lawful as part of an investigation into a completed felony, the August 22 robbery.

7

The Supreme Court has made clear that "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." United States v. Hensley, 469 U.S. 221, 229 (1985); accord United States v. Quarles, 330 F.3d 650, 653-55 (4th Cir. 2003). This rule extends from Terry v. Ohio, 392 U.S. 1, 30 (1968), where the Court held that police may perform a brief, limited stop of an individual on the street if there is reasonable suspicion that criminal activity is afoot. See also United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975) (holding that law enforcement may briefly stop a moving automobile to investigate a reasonable suspicion that the occupants are involved in criminal activity).

Here, Gerringer had a reasonable, articulable suspicion that Cabey's vehicle was involved in a completed felony because of the distinctive similarities between the vehicle and the one in the August 22 robbery surveillance video. The make, model, color (exterior and interior), distinctive vent holes, rims, fin, and blue marking on the front license area all indicated that this was the suspect getaway vehicle from the August 22 robbery. Further Gerringer observed the driver's unusual conduct near the IH Foodmart -- slow driving, look back at the store, and multiple turns that double-backed to an area within

60 to 70 yards of the store -- all of which suggested that Cabey might be casing it for another robbery. Collectively, this information constituted reasonable suspicion based on articulable facts that Casey's vehicle was the one used in the August 22 robbery. Gerringer did not need to wait until Cabey made the list of robberies a baker's dozen to make the stop. See Hensley, 469 U.S. at 229.

Moreover, the fact that the August 22 robbery occurred some six days earlier does not vitiate the lawfulness of the stop. In Hensley, the Court acknowledged that the balance "may be somewhat different" when the stop is to investigate past criminal activity, where doing so "does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity." Id. at 228. The presence of exigent circumstances, interest of crime prevention, and available alternate opportunities to choose a time for a stop are factors the Court considered. Id. Balancing these factors, the Court in Hensley found the stop that occurred twelve days after the completed felony to be constitutional. Accordingly, under the totality of the circumstances, particularly including the striking similarity of vehicles, Cabey's suspicious conduct suggesting ongoing criminal activity, and law enforcement's interest in preventing further armed robberies, the court finds that the stop of Cabey made six

9

days after the August 22 robbery was reasonable and thus constitutional.

   B.   **Canine Sniff/Probable Cause to Search the Vehicle**

Cabey objects to the use of the canine to sniff the exterior of the car. He contends that officers observed nothing to cause them to suspect that he may possess narcotics and that the use of the dog was therefore unwarranted. The Government relies upon Illinois v. Caballes, 543 U.S. 405, 409 (2005), arguing that use of a narcotics-detection dog does not result in a constitutionally-cognizable infringement upon a person's Fourth Amendment rights.

It is well established that a canine sniff does not constitute a search within the meaning of the Fourth Amendment and thus requires no additional justification. United States v. Place, 462 U.S. 696, 706 (1983); Branch, 537 F.3d at 335. A positive response from a dog trained to detect contraband, moreover, establishes probable cause. See Florida v. Royer, 460 U.S. 491, 506 (1983); United States v. Sinclair, 982 F.2d 598, 602 (4th Cir. 1993). In this case, therefore, the arrival and use of Robbie, the narcotics dog, around Cabey's vehicle was permissible and did not violate Cabey's Fourth Amendment rights. Further, once the dog alerted, law enforcement officers had probable cause to search the vehicle, as they subsequently did.

10

### C. Length of Detention

Finally, Cabey argues that officers were able to conduct the canine sniff only because Cabey was detained for an indefinite period of time that depended on how quickly officers responded with the video images of the August 22 robbery. He claims, therefore, that his detention to pursue a robbery investigation exceeded the scope of a permissible investigatory stop.[4] The Government argues that Cabey was detained no longer than reasonably necessary to have the video images delivered to corroborate Gerringer's belief that Cabey was driving the getaway vehicle from the August 22 robbery.

---

[4] Cabey was detained in handcuffs in a nearby parking lot, and while Gerringer advised him that he was not under arrest he believed that Cabey was not free to leave. Though Cabey does not challenge his detention as an arrest, which would require probable cause, the court notes that his handcuffing and detention in a nearby parking lot does not necessarily transform it into one. Here, officers had reason to believe that Cabey was the suspect in the August 22 robbery and was armed and dangerous, and his detention was reasonably necessary for officer safety. See, e.g., United States v. Elston, 479 F.3d 314, 319-20 (4th Cir. 2007) (holding that officers' drawing of weapons and placement of defendant in patrol car did not exceed the limits of a Terry stop where defendant was believed to be armed and dangerous); United States v. Hamlin, 319 F.3d 666, 671-72 (4th Cir. 2003) (handcuffing suspect, who did not feel he could leave, did not convert the stop into an arrest where handcuffs necessary for officer safety); United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (noting that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest).

Like a Terry stop, an investigatory stop relating to past criminal activity must be reasonably limited in scope:

> The precise limits on investigatory stops to investigate criminal activity are more difficult to define. The proper way to identify the limits is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test . . . balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion. . . . When this balancing test is applied to stops to investigate past crimes, we think that probable cause to arrest need not always be required.

Hensley, 469 U.S. at 228 (citations omitted). As noted earlier, the Court in Hensley balanced the exigency of the circumstances, interest in public safety, range of available opportunities to choose the time and circumstances of any stop, the interest in solving felonies and detaining suspects promptly, and the effect any restraint on officers would have on enabling a suspect to flee and remain at large. Id. at 228-29. In the end, "[t]he law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes." Id. at 229.

The parties have not cited any authority to address the length of Cabey's detention. Guidance is available from cases involving other traffic stops, however. In Branch, the Fourth Circuit stated that the maximum acceptable length of a traffic

12

stop cannot be stated with mathematical precision. 537 F.3d at 336. Rather, "the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." Id. Even in cases involving stops for traffic offenses, the stop may be prolonged if the officer has reasonable suspicion that criminal activity is afoot. Id. Terry's reasonable suspicion standard is less demanding than probable cause and thus "is considerably less than [a] preponderance of the evidence." Id. (quoting Illinois v. Wardlaw, 528 U.S. 119, 123 (2000)). In evaluating the officers' conduct, the court should take a contextual, holistic, and objective approach, applying common sense. Id. at 337; see also United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004) (holding that the totality of the circumstances must be considered in assessing the validity of a Terry stop).

In the present case, the interest in crime prevention and public safety were pressing. Twelve armed robberies of convenience stores occurred within the last month. To Cabey's bad luck, the vehicle Gerringer observed on the video images only hours earlier stuck in his mind because it was similar to that driven by his girlfriend. Thus, Gerringer testified that he believed Cabey's vehicle to be the suspect's car from the August 22 robbery. This was not just a hunch, but was based on detailed, articulable reasons. But because he did not have the

13

photos with him, Gerringer wanted to corroborate his belief and called for them to be delivered to the scene. The stop does not rest solely on the similarities between Cabey's vehicle and that of the August 22 robbery, however. Here, Gerringer also observed Cabey in conduct consistent with casing a convenience store for a robbery and was aware that the August 22 robbery suspect was dangerous because he used a handgun.

Thirty to thirty-five minutes elapsed from the initial stop until the August 22 images arrived. Though the exact timing of events was not established, it is clear that Sgt. Velez responded to the scene prior to the canine unit and stated that the images arrived about twenty to twenty-five minutes later. Corporal Edmonds testified that she arrived approximately five minutes after receiving the call to respond and performed the canine sniff prior to the arrival of the images. Thus, the canine sniff providing probable cause occurred sometime *within* the overall 30 to 35 minute period. This is certainly consistent with the time limits found to be constitutional in other Terry stop cases. See, e.g., Branch, 537 F.3d at 338 (finding 30-minute detention based on traffic stop and subsequent articulable suspicion reasonable); United States v. McFarley, 991 F.2d 1188, 1193-94 (4th Cir. 1993) (finding 38-minute detention in order to arrange for canine sniff not unreasonable); United States v. Manbeck, 744 F.2d 360, 375-76

14

(4th Cir. 1984) (finding 45-minute to one-hour detention not unreasonable).

There is no evidence that the delay was any longer than necessary for diligent police officers to pursue the investigation by having the images of the August 22 robbery delivered to the scene.  Indeed, the Terry detention was less than that because the discovery of the firearm under the vehicle armrest during the canine sniff provided probable cause for Cabey's arrest.  See McFarley, 991 F.2d at 1193-94.  Given the purpose for the detention, law enforcement's interest in solving the ongoing armed robbery spree, and the need to protect the public, the court finds the delay until the canine sniff disclosed the firearm objectively reasonable based upon the totality of the circumstances.

## III. CONCLUSION

Having carefully considered all arguments raised by the parties and for the reasons set forth above, the court concludes that Cabey's Fourth Amendment rights were not violated.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (Doc. 15) is DENIED.

>                /s/   Thomas D. Schroeder
>             United States District Judge

February 17, 2010

15